IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH REED,

                Plaintiff,

v.

ANDREW M. SAUL,
*Commissioner of Social Security*,

                Defendant.

OPINION AND ORDER

18-cv-135-wmc

Joseph Reed seeks judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g), which denied his applications for disability and disability insurance benefits, as well as supplemental security income. On appeal, Reed contends that ALJ John Martin (the "ALJ") erred by failing to: (1) adequately assess his residual functional capacity ("RFC") in light of his subjective symptoms; (2) give sufficient weight to the treating physician's medical opinion; and (3) properly evaluate claimant's obesity. (Opening Br. (dkt. #11) 1.) The court held oral argument on June 11, 2019, at which counsel for both sides appeared. For the reasons set forth below, the final decision of the Commissioner will be affirmed in part, reversed in part and remanded for reconsideration of Reed's entitlement to SSI benefits beginning in 2014.

BACKGROUND

Reed filed applications for disability, disability insurance benefits and supplemental security income on August 20, 2013, alleging a disability onset date of June 15, 2012. (AR 20.) The Social Security Administration denied his applications initially on March 25,

2014, and then on reconsideration on November 13, 2014. Reed appeared before an ALJ at a video hearing on October 25, 2016, to challenge those rulings. (*Id.*)

A. **Hearing Testimony**

Before his claimed disability on June 15, 2012, Reed was self-employed, painting houses, making furniture, and running what was described as a "two-cabin resort." (AR 55-56.) When he was 21 years old, Reed took a bad fall at work and injured his back, which prompted him to start his painting business. (AR 57.) Reed further explained that he stopped working because both his knees needed to be replaced and his shoulders would get inflamed, limiting his ability to move his arms. (AR 57-58.)

Reed also testified that he was also in "extreme" pain, such that every day is "bad, and some days it's unbearable." (AR 58.) On a scale of zero to ten, he described pain ranging from five to seven every day. (AR 59.) Reed explained that his pain is worse when he first wakes up because of his arthritis and laying in a sleeping position, despite sleeping on a modified mattress. (AR 60.) He reported needing approximately half an hour every morning just to get out of bed, including taking his pain medication before trying to get up. (AR 60-61.) To make getting dressed easier, Reed also waits until after his medications kick in each morning. (AR 63.) In addition to pain medication, Reed takes an anti-depressant, anti-inflammatory, blood pressure medication, muscle relaxer, something to control his urination, and vitamins. (AR 66-67.)

At the time of the video hearing in 2016, Reed testified that he was six feet tall and weighed 318 pounds, after losing approximately 100 pounds in the ten months following

gastric bypass surgery. (AR 51.) However, Reed reported that his weight loss did not decrease his pain. (AR 53.)

As to his activities of daily living, Reed described being able to drive for approximately one hour during a typical week, with pain increasing in his back, knees and shoulders because of the rough road near his house. (AR 52-53.) As a result, his doctors' appointments were the only times he went out. (AR 53.) Reed also testified that he could sit for approximately 20 minutes at a time without having to move around, and he was limited in his ability to twist. (AR 59.)

Given these limitations, Reed's wife helps him attend to his personal needs. For example, he cannot get out of bed in the middle of the night and must instead urinate in a container near the bed, which means that "[s]ometimes [his wife] holds [his] urine jug, and sometimes she also helps . . . wipe [his] behind." (AR 61-62; *see also* AR 75 (wife testifying claimant cannot get to the bathroom first thing in the morning and that she helps wipe his bottom when his back goes out).) Similarly, Reed is limited to showering twice a week, with his wife helping him wash his hair and his back. (AR 62.) In addition, Reed testified that he cannot stand long enough to wash dishes or vacuum, but can help prepare dinner by chopping things on the TV tray in front of his recliner. (AR 63-64.) Finally, he has not been shopping for years, and he does none of the shoveling in the winter. (AR 64.)[1]

---

[1] The medical records in this case are relatively voluminous, spanning from at least 1997 to 2016, although there are few records at the time of Reed's alleged onset date of June 2012, or in the two years immediately before or after that date. The material records and reports are discussed in the opinion below.

## B. ALJ's Decision

The ALJ concluded that Reed had a number of severe impairments: affective disorder, anxiety disorder, degenerative disc disease, major joint dysfunctions, personality disorder, and obesity. (AR 22.) He explained that Reed's back MRIs showed "degenerative changes," as well as "a small disc protrusion without nerve root displacement," and "mostly mild to moderate abnormality with foraminal narrowing that would result in L4 or L5 radiculopathy." (AR 23.) He also found Reed morbidly obese, even after his bariatric surgery, with a BMI ranging from 43.4-54.8. (*Id.*) Finally, the ALJ recognized that Reed had "mild to moderate bilateral knee osteoarthritis" following knee surgery in 2013, as well as "mild to moderate degenerative joint disease" in his shoulders. (*Id.*)

Despite Reed's testimony about his many limitations, the ALJ found his "statements concerning the intensity, persistence and limiting effects of [his] symptoms" to be "not entirely consistent with the medical evidence and other evidence in the record." (AR 26.) As an initial matter, the ALJ noted that he "attributed his physical problems to a 1991 work accident and a number of subsequent falls," but that all of "these falls occurred well before his alleged onset date." (*Id.*) Likewise, Reed had reported approximately the same level of pain for years, and he had been taking narcotics and other pain medications for years for the same issues, yet continued to work during much of this time, such that the ALJ found Reed could have continued working after his alleged onset date. (*Id.*) Reed also continued performing some work *after* his alleged onset date, even though he delegated more of the physical labor to others. (AR 27.)

4

Next, the ALJ noted Reed's "conflicting information about the effectiveness of treatment." In particular, the ALJ questioned Reed's assertion that treatment was ineffective, noting that he could perform physical tasks without significant pain during treatment, and he only seemed to complain about pain after engaging in strenuous activities. (*Id.*) Nor did the medical records corroborate claimant's alleged restrictions. Rather, those records confirmed that Reed's "treatment effectively relieved his pain, except for those occasions when he engaged in strenuous activities." (*Id.*) For example, following Reed's knee surgery: (1) his doctor released him to return to work without restriction; (2) he could get on and off the exam table without assistance; and (3) he did not require postoperative physical therapy because the procedure was so routine. (AR 27-28.) Similarly, the record revealed that his medication side effects were mild. In particular, the record reveals that his medications did not significantly interfere with Reed's ability to perform work activities. (AR 28.)

As to the medical opinion evidence in the record, Reed's treating physician, Dr. James Dunn, opined that he would miss at least four days of work each month, although the ALJ noted that Dr. Dunn "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant." (*Id.*) The ALJ also found Dunn's opinion to be "inconsistent with the claimant's reports [that he was] still operating a resort and doing yard work to some degree in 2013," as well as "with the fact that the claimant was sustaining medium to heavy exertional work with many of the same treatment and objective findings by the doctor." (AR 28-29.) Accordingly, the ALJ gave Dunn's opinion

5

little weight, while giving the opinions of the state agency physicians, Ruiz and Byrd, partial weight.[2]

In determining Reed's RFC, the ALJ concluded that he could perform sedentary work, with specified limitations: (1) no ladders, ropes, scaffolds, unprotected heights, moving machinery, operating motor vehicles, or concentrated exposure to extreme cold; (2) occasional ramps, stairs, balancing, stooping, kneeling, crouching, crawling; and (3) only "simple, routine and repetitive tasks that are not performed at a production rate pace," "simple work-related decisions," and no more than "10% of off-task time in addition to regular breaks." (AR 25.) Finally, the ALJ concluded that there were "jobs that exist in significant numbers in the national economy that the claimant can perform," including as an order clerk or call-out operator. (AR 30.) Accordingly, the ALJ found that Reed was not disabled and denied his applications. (AR 30-31.)

OPINION

The court must defer to an ALJ's decision to deny benefits unless it is unsupported by substantial evidence or based on an error of law. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In addition, the ALJ must build an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled. *McKinzey v. Astrue*, 641 F.3d

---

[2] The ALJ may have valued Drs. Ruiz and Byrd even more, except that additional evidence was submitted after they had conducted their review, and that later evidence supported a more restrictive RFC. (AR 29.)

6

884, 889 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). As a result, a reviewing court is not to "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citations omitted). Still, the court must conduct a "critical review of the evidence" before affirming a decision to deny benefits. *McKinzey*, 641 F.3d at 889.

As noted previously, claimant takes issue with various aspects of the ALJ's analysis here, contending they warrant reversal. Ultimately, with respect to the alleged onset date of June 15, 2012, the ALJ appropriately treated the opinions of Reed's treating physician, considered the impact of Reed's morbid obesity, and found insufficient evidence to award benefits. Still, remand is necessary because the ALJ inadequately considered evidence of Reed's worsening condition beginning in 2014 for purposes of his claim to supplemental security income.[3]

## I. Treating Physician

Dr. James Dunn provided three separate opinions on Reed's ability to sustain work activities. In the June 28, 2014 Physical Work Capacity & Pain Questionnaire, Dunn explained that Reed's "problems have been progressive especially [in the] past 18 months," adding that Reed's pain was "constant" and ranging from 5/10 to 10/10, resulting in a decreased range of motion for his neck, shoulders, knees and lower back. (AR 782.) As such, Dunn opined that Reed would "several times an hour" need to lie down during work,

---

[3] As discussed at oral argument, Reed only qualified for disability insurance benefits through September 30, 2013.

necessitating him being away from his workstation "50% of the time." (AR 783.) Likewise, Dunn opined that Reed's pain would "constantly" be severe enough to interfere with his attention and concentration making him incapable of tolerating a low-stress job, and he would need to take unscheduled breaks "equal to time spent standing / sitting for 18-30 minutes to lie down." (AR 784, 785-86.)

In his Medical Source Statement from November 24, 2014, Dr. Dunn opines that Reed could sit for four hours and stand or walk for 0-2 hours; could rarely lift up to 10 pounds, but never heavier weights; limited his grasping, fingering, and handling; and prohibited stooping, bending and crouching. (AR 364.) He also opined that Reed's pain would frequently be severe enough to interfere with his attention and concentration and that he would miss more than four days of work per month. (AR 364-65.) Dunn also noted that Reed no longer was his patient as of that November 2014 statement. (AR 364.)

Nevertheless, Dr. Dunn provided another medical source statement dated October 13, 2016. He opined that Reed could sit or stand/walk up to two hours per day, rarely lift at most 10 pounds, and never stoop or crouch. (AR 1353.) He also maintained his earlier opinions that Reed's pain would frequently be severe enough to interfere with his concentration and attention and that he would miss more than four days of work per month. (AR 1353-54.)

Claimant argues that the ALJ failed to comply with 20 C.F.R. § 404.1527 by inappropriately weighing the medical opinions in the record. Specifically, claimant asserts that the ALJ: (1) failed to give controlling weight to the opinion of his treating physician, Dr. Dunn, simply because Dunn is not a specialist and relied on claimant's subjective

symptom reports; and (2) gave greater weight to the consulting state agency physicians, who did not examine the claimant and did not review the entire medical record. (Opening Br. (dkt. #11) 41-43.) As to the weight given to the limitations proposed by Dunn, defendant contends that the ALJ appropriately discounted his opinion because the limitations were not supported by the treatment records, conflicted with evidence of claimant's activities, and Dunn is not a specialist. (Opp'n (dkt. #12) 11.)

Generally, the opinions of a claimant's treating physician are "give[n] more weight" because he or she is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(d)(2) (2011). Even where a treating physician's opinion is not given controlling weight, a number of factors must be considered by the ALJ to determine how much weight to give different medical opinions, including "[l]ength of treatment relationship and the frequency of examination"; "[n]ature and extent of the treating relationship"; supportability; consistency; specialization; and "[o]ther factors . . . which tend to support or contradict the medical opinion." *See* 20 C.F.R. § 404.1527(d) (2011). For these reasons, "[a]n ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).

While Dr. Dunn's relationship with Reed was longstanding, the court agrees the ALJ provided good reasons for finding that Dunn's proposed limitations are more

9

restrictive than the medical record can support. As discussed below, the medical records demonstrate that Reed continued working long after the accident that precipitated his applications, and his symptoms were noted to have worsened well *after* his alleged onset date of June 2012.[4] Certainly, nothing appears to have changed around June 2012. In fact, there are relatively few records from the time period around June 2012, and those that do exist do not support his claim of disability. (*See, e.g.*, AR 627 (May 2012 noting Reed "and his brother work as painters."); AR 543 (Reed "stated that the Toradol injection helped tremendously" in July 2012).)

Additionally, as noted by the ALJ, Dunn's notes from his June 28, 2014, office visit with Reed, state that "[w]e went through the document question by question reviewing appropriate radiological and historical information including consults and other prior documentation" and their "continued . . . ongoing discussion of his anxiety disorder and social phobia . . . as it regards his generalized musculoskeletal pain." (AR 818.) This at least supports the ALJ's expressed concern that Dunn's opinion may have been attributed to an over-reliance on Reed's self-reported symptoms in completion of the first form. Finally, the ALJ was not mistaken in considering Dunn's family practice specialty in weighing his opinion because that is one of the factors expressly identified by the regulations for consideration. 20 C.F.R. § 404.1527(d)(5) (2011) ("We generally give

---

[4] In reply, claimant's argument that Dunn's two RFC opinions are consistent with each other (Reply (dkt. #13) 3) is largely beside the point. The question is *not* whether Dunn's opinions were consistent with each other, but were they consistent with his treatment records and the other evidence.

more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Turning to the ALJ's treatment of the state-agency physicians, Dr. Jose Ruiz opined on February 4, 2014, that claimant could occasionally lift 25 pounds, frequently lift 20 pounds, and stand, walk, or sit for six hours a day. He could also frequently climb ramps or stairs, balance and occasionally stoop, kneel, crouch or crawl, but never climb ladders, ropes or scaffolds. (AR 96-97.) Based on degenerative joint disease in both knees, morbid obesity and degenerative disc disease, Dr. Janis Byrd similarly opined on November 11, 2014, that claimant could: occasionally lift 20 pounds and frequently lift 10; stand or walk six hours a day; and sit for about six hours a day. (AR 151.) Defendant contends that the ALJ only gave their opinions partial weight because (1) later evidence suggested claimant required a more restrictive RFC than they had proposed and (2) the ALJ limited claimant to sedentary, instead of light, work. (Opp'n (dkt. #12) 12-13.) This more balanced analysis appears justified on the record at least after 2014, even if not back as far as claimant would have wanted.

## II. RFC and Subjective Symptoms

Claimant next argues that the ALJ's formulation of Reed's RFC is wrong because the record does not support factual findings that he could perform sustained work activities or a range of sedentary work. Instead, claimant argues that the records compel a finding that his "abilities are well below what is contemplated in SSR 96-9p." (Opening Br. (dkt. #11) 37-38.) Specifically, he points to: the assistance his wife provides in cleaning and relieving himself; his reliance on an assistive device to walk; his inability to do household

chores; and other physical limitations that preclude both his activities of daily living and his ability to perform sedentary work. (*Id.* at 37-40.) Likewise, he contends that the ALJ improperly discounted these symptoms simply because they are subjective, and that the ALJ further failed to account for his medications' side effects. (*Id.* at 43, 45-46.)

In response, defendant contends that substantial evidence of record supports the ALJ's conclusion that claimant was not disabled by his claimed, subjective limitations, including: (1) the objective medical evidence, which not only failed to "portray an individual with disabling symptoms," but contain the images of his back, shoulder and knee ranging from normal to mild to moderate limitations (Opp'n (dkt. #12) 5-6); (2) claimant's alleged onset date of June 2012 was many years after the initial 1991 work accident and subsequent falls to which claimant attributed his physical problems; (3) claimant's continued work in the intervening period (*id.* at 7-8); (4) claimant's statements about the effectiveness of his treatment were contradictory, reflecting that the treatments were effective until "his symptoms were exacerbated [by] engag[ing] in more strenuous activities" (*id.* at 8-9); (5) the ALJ considered claimant's alleged medication side effects and found them to be mild (*id.* at 9); (6) the record evidence does not support claimant's assertions that he required an assistive device to walk, was unable to stoop, crouch or kneel, or had reaching and handling limitations (*id.* at 9-10); and (7) the ALJ's credibility assessment was sufficient (*id.* at 10-11).

For many of the reasons identified by the government, the court concludes that the ALJ's determination that claimant was not disabled as of his alleged onset date was adequately supported by substantial evidence. First, while the medical records point to his

1991 fall as the start of his physical problems, Reed continued working and exerting himself for years, albeit "with bad sometimes terrible pain." (AR 326.) (*See also* AR 456 (in January 2012, he "report[ed] that he avoids heavy lifting however the patient report[ed] he just moved a refrigerator"); AR 457 (Reed was still working as a painter and resort owner in mid-January 2012); AR 627 (in May 2012, Reed reported pushing himself to continue painting, but "*beginning* to consider that he may need to pursue other vocational options in the future." (emphasis added)).) These and similar activities continued beyond his alleged onset date of June 15, 2012. (*See* AR 619 (in September 2012, Reed was "doing a lot of work around the resort buttoning it up . . . to prepare it for sale"); AR 465 (in January 2013, Reed "report[ed] he was doing some lifting and experienced a large increase in his back pain"); AR 533 (in June 2013, reported doing a lot of work getting the resort ready for opening, aggravating his knees); *id.* ("The patient also owned painting business, was up and down ladders and this was aggravating his knee."); AR 993 (mid-2015 reported still having two-cabin resort that he "works around there a little bit as able, but limited").)

All of these activities were reported despite the fact that before 2012 his medical records reflects reports of significant pain. (AR 1122 (reporting 1998 incident when he was stuck on the garage floor for two days); AR 1109-10 (in March 2001, his shoulder pain was described as "likely to be chronic" and noting prior dislocations in high school); AR 1063 (in January 2005, claimant reported back pain as ranging from 2/10 to 10/10 and being present 80% of the time); AR 1060 (in February 2005, noted pain reached from 5/10 to 9/10 and decreases his activity to 70% of normal and interrupts his sleep).) In fact, in January 2014, Orthopedist Dr. Hugh Bogumill counseled Reed "that even though it may

make the knees hurt, it is not going to do any damage to be active and to do things" advising "him to be as active as possible." (AR 1036.)

Second, after his alleged onset date, objective medical data revealed moderate problems at most. In June 2014, x-rays showed "degenerative arthritis with narrowing primarily in the medial compartment," as well as "osteophytic spurring on his patellofemoral joint." (AR 776.) Similarly, in July 2014, medical records reflect that he had "[m]ild-moderate multilevel degenerative disc disease," "[m]oderate multilevel facet arthropathy," "[m]oderate-severe right L4-L5 foraminal narrowing" resulting in right L4 radiculopathy, "[m]ild-moderate right L5-S1 and moderate left L5-S1 foraminal narrowing," resulting "in a right or left or right and left L5 radiculopathy." (AR 744.) As to his shoulder, he had "[m]oderate supraspinatus and subscapularis tendinopathy with bursal surface fraying of the supraspinatus tendon," but "[n]o full-thickness rotator cuff tear." (AR 747.) He also had "[s]uperior labral tear," and "[m]ild to moderate osteoarthritis [in the] left acromioclavicular joint." (*Id.*) As to his knees, he had "[s]table mild to moderate bilateral medial compartment predominant knee degenerative joint disease causing mild bilateral genu varus." (AR 1021.) "Bilateral knee pain with moderate osteoarthritis but not bone-on-bone." (AR 1025.) Even the June 2014 reported findings of "[m]oderate osteoarthritis of both knees with mild resulting varus deformity" and "[b]ilateral trace joint effusions" were found to be "worse when compared with the previous exam." (AR 1027.)

Third, the record shows that claimant's medication side effects were relatively mild. (AR 1060 (reporting no side effects); AR 365 (identifying constipation and irritability as

side effects); AR 783 (identifying side effect as "mild nausea"); AR 1354 (identifying irritability as a side effect); *but see* AR 330 (identifying "constipation till [he] bleed[s], drowsiness, [and] bad taste in mouth").)

Fourth, the record shows that claimant's symptoms improved, at least at times, with treatment. (AR 457 (noting Reed reported epidural and facet injections were helpful); AR 461 (recording claimant's report that "he took a walk to the neighbors and came home and showed his wife how he had increased range of motion of his lumbar spine" following bilateral medial branch blocks); AR 463 ("On our first visit I was unable to just talk with the patient as he was in writhing pain. In order [for] the patient's pain to settle down I have to give the patient a Dilaudid injection. Today the patient was able to sit and converse with me without any problems. Patient does report some pain while sitting."); AR 464 (following trigger point injections, Reed "reported he felt much better" and "denied having any pain in his low back"); AR 623 (Reed noted having "had a very positive experience with a Toradol injection," which decreased "his generalized aches and pains which lasted for at least a couple of weeks prior to the gradual recurrence of his discomfort.").

Finally, because an ALJ is well-placed to determine the credibility of a witness, a court "will not overturn an ALJ's credibility determination unless it is patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (internal quotation marks omitted). Consequently, "[t]his court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding." *Id.* at 505. Here, the reasons addressed above were all identified by the ALJ for discounting claimant's

15

statements about the limiting effects of his symptoms, and thus the discounting is adequately supported by the record.[5]

While the ALJ's conclusion of non-disabled as of the alleged onset date is well supported, his analysis of the record thereafter is lacking. In particular, the ALJ briefly addresses claimant's bariatric surgery and some of his evaluations in 2014, but he does not address the evidence demonstrating a worsening of Reed's symptoms. (*See* AR 880 (in July 2013, "[w]e had previously discussed his subjective need and the very objective reality that he is beginning to have serious medical problems related to morbid obesity."); AR 852 (in January 2014, Dr. Dunn described Reed's knees as having "significant degenerative joint disease in both knees"); AR 837 (in March 2014, Dunn noted that the pain medication was "less effective over time"); AR 772 (Dunn noting in April 2014 that Reed's "knees have not responded to corticosteroid injections, viscosupplementation" and "Orthopaedics have had little to offer."); AR 827 (Dr. Indravadan Kansariwala noted in May 2014 that Reed's pain "is progressively getting worse," especially for the past year); AR 1030 (one treatment provider considered him to have "significant arthritic symptoms secondary to is super morbid obesity" in June 2014); AR 934 (January 2016: "Things have progressed to the point now where he has constant pain."); *but see* AR 465 (in January 2013, Reed "report[ed] he was doing really well with his back pain until about 4 weeks ago.") AR 472

---

[5] Whether the medical evidence supported Reed's claimed need for an assistive device seems somewhat beside the point because the administrative record contains numerous references to his use of one. (AR 72 (claimant used walker to come in for his hearing); AR 109 ("Crutches and walker used for ambulation which were prescribed."); AR 369-77 (letters noting use of walker); AR 724 (noting "he entered the room with a walker" for his mental status exam); AR 775 ("Support: walker."); AR 800 ("He uses a walker to go to the bathroom in the morning.").)

(a few days following torn meniscus on April 30, 2013, Reed was able to "walk with a severe limp").)

Likewise, as time went on, the objective medical evidence reflect worse than mild to moderate problems.[6] (AR 744 (July 2014 x-ray showed "[m]oderate-severe right L4-L5 foraminal narrowing," resulting "in a right L4 radiculopathy"); AR 804 (in August 2014, Dunn noted "a significant tear on the left and progression of his degenerative changes over the right, over what is a fairly short period of time"); AR 922 (December 2015 x-ray showed "severe acromioclavicular joint degeneration"); AR 739 (August 2014 x-ray showed Reed's left knee had: (1) "Complex tear medial meniscus"; and (2) "Tricompartmental degenerative cartilage changes with small high-grade defects in all compartments, which appear to have progressed since prior exam"); AR 742 (August 2014 x-ray showed Reed's right knee had: (1) "Interdevelopment of high-grade cartilage defects in the medial compartment with associated subchondral edema"; and (2) "Tricompartmental degenerative changes with high-grade defect also present in the patellofemoral compartmental.").)[7]

---

[6] In April 2014, Dr. Dunn noted a 2010 MRI "which showed . . . significant degenerative changes with facet joints, with multiple possible pain generators." (AR 772.)

[7] Admittedly, there are post-2014 examples of claimant's continued work activity that may be a basis to deny claimant benefits on remand. (AR 1005 (June 2015 reported walking around the resort, completing at-home exercises, cooking, and cleaning the house); AR 949 (Reed injured his shoulder "doing some auto repair on a gas tank," having been "underneath the car, . . . re-wiring and strapping up a gas tank" in December 2015); AR 993 (June 2016 noted Reed "works around [the 2-cabin resort] a little bit as able, but limited").) However, the medical evidence shows a worsening of Reed's condition that must also be addressed.

**III. Obesity**

Finally, claimant contends that the ALJ, despite concluding that his obesity was a severe impairment, failed to consider its impact on his ability to work. (Opening Br. (dkt. #11) 47.) Defendant disagrees, arguing that the ALJ appropriately evaluated claimant's obesity and its impact on his ability to work and that claimant failed to put forth evidence demonstrating that his obesity required greater limitations in the RFC. (Opp'n (dkt. #12) 13-14.) As an initial matter, claimant's medical records are filled with references to his obesity and how it contributed to his other problems. (*See, e.g.*, AR 727 ("This individual appears to have problems that are associated to past injuries that are greatly exacerbated by his massive obesity."); AR 777 (June 2014: "I think that he probably has significant arthritic symptoms secondary to his super morbid obesity."); AR 861 (noting Reed's frustration about how his legs were not improving at the end of November 2013, with Dunn adding he found it "quite understandable" because Reed was "still a very large man."); AR 880 ("We had previously discussed his subjective need and the very objective reality that he is beginning to have serious medical problems related to morbid obesity. He already has sleep apnea, degenerative disease of his back and knees. He is also having some borderline metabolic issues.").) As discussed at oral argument, however, there is no bright-line rule for how an ALJ is to consider obesity.

The ALJ's consideration of claimant's obesity in terms of its impact on his other conditions, following the example of his treatment providers, is not reversible error. Likewise, claimant fails to point to any portions of the administrative record outside his own testimony that his obesity further limited his functioning. Regardless, given that this

case is being remanded for reconsideration of claimant's possible entitlement to SSI benefits beginning sometime in 2014, the ALJ will necessarily have to consider how, if at all, the claimant's obesity may have contributed to his other physical limitations.

ORDER

IT IS ORDERED that: the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Joseph Reed's application for disability and disability insurance benefits and supplemental security income is AFFIRMED in part, REVERSED in part AND REMANDED in part consistent with the opinion set forth above.

Entered this 26th day of September, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge